SCRANTON STEEL CO. *v.* WARD'S DETROIT & LAKE SUPERIOR LINE.

*(Circuit Court, E. D. Michigan.* December 2, 1889.)

1. INSURANCE—CONTRACT TO INSURE.
   A promise to insure, made by one whose business is to insure, is performed by issuing a policy. A like promise, make by one whose business is not to insure, is performed by the promisor procuring a policy in some responsible company to the full insurable value of the property.

2. SAME—AGREEMENT BY CARRIER TO INSURE.
   Hence, where a transportation company agreed to carry a certain cargo, and to insure the same, it was *held* to have substantially satisfied its obligation by causing the cargo to be insured to the full amount of the loss sustained.

3. SAME—ESTOPPEL.
   Plaintiff intrusted certain cargoes of rails to the Erie Railroad, to carry to Buffalo, and forward thence to Duluth by water. Defendant contracted with the agent of the road at New York to carry them from Buffalo to Duluth, and to insure them. It procured certificates of insurance to be issued, and deposited them with the agent of the road at Buffalo, of whom it received the cargo, but had no direct dealing with the plaintiff. *Held,* that the receipt and retention of these certificates by the agent of the road, without objection, estopped the plaintiff from objecting to the form of the policies or the amount of the insurance.

*(Syllabus by the Court.)*

This was an action to recover damages for the loss and injury to a cargo of 357½ tons of steel rails, which the defendant had agreed to carry from Buffalo to Superior City, Wis., and to insure against the perils of the sea. The first count of the declaration averred that the defendant promised and agreed with the plaintiff to carry said rails from Buffalo to Superior City, and also to insure the safe carriage of the rails as aforesaid against all the perils of the sea; that, in pursuance of such agreement, on or about November 6th, the defendant's steamer Northerner left Buffalo with the said cargo of steel rails, and before reaching Superior City was burnt and sunk, and her said cargo of rails thereby was lost, destroyed, or damaged; whereby defendant became indebted and liable to pay the plaintiff the amount of such loss. The second count averred a parol promise with the plaintiff to carry the rails and also to procure insurance for the safe carriage of the rails, to their full value, against perils of the sea. Breach, that the Northerner was burnt and sunk, whereby her cargo was lost and destroyed; that the defendant failed to procure insurance to the full value of said steel rails, according to its said agreement; whereby defendant became indebted to the plaintiff in the sum of $5,000.

At the request of the parties the court found the following facts:

(1) Plaintiff is a manufacturer of steel rails, doing business at Scranton, in the state of Pennsylvania.

(2) Defendant is a common carrier of merchandise between ports upon the Great Lakes, and is the owner and proprietor of the steamer Northerner.

(3) Early in September, 1886, plaintiff, which had sold a large amount of rails to the Northern Pacific Railroad Company, deliverable at Duluth, Minn., and Superior City, Wis., made application to John S. Hammond, general freight agent of the New York, Lake Erie & Western Railroad, at New York, for a rate on 2,500 tons of steel rails to be shipped from Scranton to Superior City. He named a rate from Scranton to Buffalo, delivered on the docks of

the road. About the same time Capt. Eber Ward, manager of the defendant line, called upon Mr. Hammond, and agreed upon a rate of two dollars per ton from Buffalo to Superior City, and he (Ward) was to insure the same on the lakes. Ward did not know then, nor at the time of the loss, to whom the rails belonged.

(4) It is the custom for managers and agents of transportation companies upon the lakes to take out policies of insurance in responsible companies, running to themselves as agents, for account of whom it may concern, and covering all such cargoes as their customers may desire to have insured. Upon the receipt of any such cargoes the agent issues a certificate payable to himself for the benefit of whom it may concern, specifying the cargo, the amount insured, the name of vessel, and the port from and to which it is to be carried. In pursuance of such custom, the British-America Assurance Company, on May 12, 1886, issued to Capt. Ward, the defendant's manager, an open policy, a copy of which is hereto attached.[1]

(5) The first shipment under the contract with **Hammond** was made Octo-

_____

[1] Cargo Policy.
Lake.

### The British-America Assurance Co., of Toronto, Ontario.

By this policy of insurance, on account of Eber Ward, Ag't,
For account of whom it may concern:

Do make insurance, and cause the several persons indorsed thereon, or in book attached hereto, to be insured, upon all kinds of lawful goods, wares, merchandise, and produce, laden on board the good vessel or vessels, boat or boats, railroad or carriage, lost or not lost, at and from ports and places, to ports and places, on a lawful and regular route and voyage, for the several amounts, and at the rates as herein indorsed, subject to the conditions of this policy, or of any contract proposition covered by this policy, according to their true intent and meaning.

Beginning the adventure upon the said property from and immediately following the loading thereof, at the port or place named in this indorsement, and so shall continue and endure until the same shall arrive and be safely landed at the port of destination, and not to exceed forty-eight hours from the time of arrival,

Touching the adventures and perils which the said British-America Assurance Company is contented to bear and take upon itself, they are of the lakes, rivers, canals, railroads, fires, jettisons, and all other perils and misfortunes that have or shall come to the hurt, detriment, or damage of the said property, or any part thereof, excepting all perils, losses, or misfortunes arising from the want of ordinary care and skill in loading and stowing the cargo of or in navigating the said vessel, from theft, barratry, or robbery, or other legally excluded causes. And, in case of loss, or misfortune, it shall be lawful and necessary to and for the insured or insurer, their agents, factors, servants, and assigns, to sue, labor, and travel for, in, and about the defense, safeguard, and recovery of the said goods and merchandise, or any part thereof, without prejudice to this insurance; nor shall the acts of the insured, or insurers, in recovering, saving, and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment, nor as affirming or denying any liability under this policy, but such acts shall be considered as done for the benefit of all concerned, without prejudice to the rights of either party; to the charges whereof the said company will contribute to such proportion as the sum herein insured bears to the whole value of the property so insured. Moneys and bullion, promissory notes and other evidences of debt, books of account, written securities, deeds, or other evidences of title to property of any kind, are not covered by this policy, unless expressly defined as so insured.

And, in case of loss, such loss shall be payable in thirty days after satisfactory proof thereof. Proof of interest of assured in said property and adjustments shall be made and presented at the office of this company; all sums owing by the assured to this company being first deducted or secured to the satisfaction of this company, before such loss shall be paid: Provided, always, and it is further hereby agreed, that if the said insurer shall have made any other insurance upon the property aforesaid, prior in date to this policy, then the said British-America Assurance Company shall be answerable only for so much as the amount of such prior insurance may be deficient towards fully covering the property hereby insured; and the said British-America Assurance Company shall return the premium upon so much of the sum by them insured as they shall be by such prior insurance exonerated from. And, in case of any insurance upon said property subsequent in date to this policy, the said British-America Assurance Company shall nevertheless be answerable for the full extent of the sum by them subscribed

ber 7th, through Henry L. Chamberlain, of Buffalo, the agent of the defendant in its transportation business, and also the agent of Capt. Ward in his insurance business. The succeeding shipments were made October 12th, October 15th, October 19th, and November 3d. These shipments were all consigned to C. E. Bailey, engineer of the Eastern Minnesota Railroad, Superior, Wis., and all arrived in safety. · Upon making such shipments in each case, Chamberlain made out a certificate of insurance, in the form hereto annexed, upon blanks signed by Ward as agent of the British-America Insurance Company, under the policy above named. These certificates were sent by him to O'Shea, agent of the .New York, Lake Erie & Western Railroad at Buffalo, from whom the consignments were received. These certificates were retained by O'Shea, and were never sent to the plaintiff or to Hammond.

(6) On November 8, 1886, a shipment was made upon the propeller Northerner of 357½ tons of steel rails. The annexed certificate was issued by Chamberlain .upon the blank furnished by Ward for $11,797, and sent to O'Shea. This was at the rate of $33.33 per ton, the value of the iron being $38. This certificate was retained by O'Shea until July, 1887, when it was delivered to the agent of the plaintiff.

(7) In the course of the voyage through Lake Erie, and about November 12th, the Northerner took fire, burned to the water's edge, and sank. Her cargo was subsequently raised and delivered. Of the entire 357½ tons, 20 tons were worthless, and a total loss. Their value, at $38 per ton, was $760. The remaining 337½ tons were sold, at $25 per ton, to the Northern Pacific Railroad, and this was their value. Consequently upon this portion of the shipment

hereto, without right to claim contribution from such subsequent insurers, and shall accordingly be entitled to retain the premium by them received, in the same manner as if no subsequent insurance had been made. And, in case of loss or damage to the property hereby insured, this company, its agent or representative at or nearest the first port of discharge, shall have prompt notice of same, and shall have every opportunity and facility for ascertaining the cause, extent, and amount of damage, by personal inspection, appraisal, or sale of the damaged property.

It is also agreed that the property be warranted by the insured free from any charge, damage, or loss which may arise in consequence of a seizure or detention for or on account of any illicit or prohibited trade, or any trade in articles contraband of war. ·It is furthermore hereby expressly provided that no suit or action against this company, for the recovery of any claim for loss or damage, upon, under, or by virtue of this policy, shall be sustained in any court of law or equity, unless such suit shall be commenced within the term of twelve months next after the loss or damage shall occur; and in case any such suit or action shall be commenced, after the expiration of twelve months next after such loss or damage shall have occurred, the lapse of time shall be taken and deemed as conclusive evidence and conclusive defense against the validity of the claim thereby so attempted to be enforced.

It is also agreed and understood that, in case of loss or damage under this policy, the assured, in claiming and accepting payment therefor, hereby, and by that act, assigns and transfers all his or their right to claim for such loss or damage, as against the carrier, or other person or persons, town or corporation, or the United States or foreign governments, to this company, and to prosecute therefor at the charge and for account of this company, if requested; to inure to their benefit, however, to the extent only of the amount the loss or damage and attendant expenses of recovery, paid or incurred by the said British-America Assurance Company; and any act of the insured, waiving or transferring, or tending to defeat or decrease, any such claim against the carrier, or such other person or persons, town or corporation, or United States or foreign governments, whether before or after the insurance was made under this policy, shall be a cancellation of the liability of this company, for or on account of the risk insured for which loss is claimed.

And it is understood and agreed that this company or its agent shall have free access, at all reasonable hours, to the books, accounts, instructions, and correspondence of the assured, containing statements of, or which relate to, shipments and receipts ·covered by this policy; and this policy may be declared void by either party, on giving a written notice to that effect to the other party, but without prejudice to any shipment or liability made or incurred, prior to the service of such notice.

*Deck Cargoes.* It is understood that property covered by this policy on lake vessels shall be under deck, unless otherwise specified and charged for additionally in the in-

there was a loss of $13 per ton, or $4,388.50. Plaintiff has thereby suffered damages in the amount of $5,148.50.

The following is the certificate referred to in findings 5 and 6:

<div style="margin-left:2em">

No. 5,762.  Lake Cargo.  **$11,797.**

BRITISH-AMERICA ASSURANCE COMPANY, TORONTO.

BUFFALO, Nov. 8, 1886.

This certifies that Eber Ward, manager, is insured under and subject to conditions of lake-cargo policy No. ——, in the sum of eleven thousand seven hundred and ninety-seven dollars on three hundred fifty-seven and one-half tons steel rails, shipped on board of propeller Northerner, ——, $11,797, at and from Buffalo to Superior, Wis. Loss, if any, payable to assured or order on return of this certificate. This certificate is not valid unless countersigned by the authorized agent of the company at place of issue.

C. W. ELPHICKE & Co., General Agents.

J. J. HIGMAN, Marine Manager.

EBER WARD, Agent.

</div>

*James C. Smith* and *John H. Bissell,* for plaintiff.
*Dwight C. Rexford,* for defendant.

BROWN, **J.** The first count in the declaration charges the defendant transportation company with having agreed to carry and to *insure.* The

dorsement thereon, and deck cargoes are insured against total loss of packages only. The minimum rates of such loss to make a claim shall be ten per cent., except salt, which shall be twenty per cent. of the whole number of packages insured on deck, and in all cases, on deck risks, to be free from damage by wet, breakage, leakage, or exposure.

Warranted by the insured free from any claim for loss or damage arising from civil commotion, seizure, detention, or the consequences of any hostile act of the United States or foreign governments; also from any loss or damage from piracy or letter of marque, or the acts of any government hostile to the United States.

Warranted by the insured free from any damage or injury, from dampness or frost, heating, sweating, steaming, change of flavor, or being spotted, discolored, musty, or mouldy, except caused by actual water contact with the article damaged, and to be free from liability for leakage, on molasses or other liquids, or breakage of articles liable to break from their own nature, unless occasioned by the perils insured against. If the voyage aforesaid shall have been begun, and shall have terminated, before the date of this policy, then there shall be no return of premium on account of such termination. No shipments to be considered as insured until approved and indorsed on book attached hereto, by Eber Ward, Ag't, the agent of this company at Detroit, Mich.

This policy is subject to the usages and regulations of the port of New York in all matters of adjustment and settlement of losses and averages not herein otherwise clearly specified and provided for, as may be stated by a competent and disinterested adjuster of marine losses, to be designated by the insurers; but no damage to be paid unless amounting to five per cent.

It is understood and agreed, as one of the conditions under which this policy is issued and indorsement made thereon, that, if the insurance is procured by any person or persons other than the assured, they shall be deemed the agent or agents of the assured, and not of this company, in any and all transactions relating to this insurance.

And it is hereby understood and agreed, by and between this company and the assured, that this policy is made and accepted in reference to the foregoing terms and conditions, which are hereby declared to be a part of this contract, and are to be used and resorted to in order to determine the rights and obligations of the parties hereto, in all cases not herein otherwise specially provided for in writing.

In witness whereof the British-America Assurance company have caused these presents to be attested by their manager at Toronto. But this policy shall not be valid unless countersigned by C. W. Elphicke & Co., general agents of the British-America Assurance Company at Chicago, Ill.

Attested:  J. J. HIGMAN, Marine Manager.

Countersigned at Chicago this 12th day of May, 1886.

C. W. ELPHICKE & Co., General Agents.

second count differs from the first only in its averment of agreement to carry and to *procure insurance* to the full value of the rails. The agreement was an oral one between Hammond, agent of the Erie road, at New York, and Ward, the manager of the defendant line. While the conversation is somewhat differently stated by the two witnesses. I am satisfied, and have found as a fact, that Ward agreed to carry the rails, and to insure them, at two dollars per ton. The meaning of those words, then, becomes a question of construction for the court. Did Ward thereby intend that the defendant transportation company should insure these personally, or was it the intention that he, acting as agent for this line, should procure them to be insured in some responsible company? The authorities recognize a clear distinction between a contract *of* insurance and a contract *to* insure, in the fact that the former is executed and the other is executory. In the one case the action is upon the contract for the loss or damage sustained under the risk, while in the other the action is for a breach of the contract for not insuring, and the measure of recovery is the loss sustained thereby. The weight of authority is that a parol contract to insure will be enforced in equity even though the charter of the company requires its contracts of insurance to be in writing; the courts holding to a distinction between an executory and executed contract, and that the charter provisions can only be held to apply to the latter. This was the construction given by the supreme court of the United States to a statute of Massachusetts in *Insurance Co.* v. *Insurance Co.*, 19 How. 318. See, also, *Insurance Co.* v. *Shaw*, 94 U. S. 574; *Sanborn* v. *Insurance Co.*, 16 Gray, 448; *First Baptist Church* v. *Insurance Co.*, 19 N. Y. 305; Wood, Ins. § 11; May, Ins. § 23. Most of the cases in which the distinction is taken have arisen in actions against fire insurance companies for failing to issue policies in which the measure of damages is the same as if a policy had been issued. In such cases the courts would naturally interpret the contract to insure *as a contract to issue a policy* in the defendant company; but, where the promise is made by a person or corporation whose business is not to insure, the authorities indicate that it is satisfied by the promisor's procuring a policy in some responsible company to the value of the property insured. There is no doubt that when a factor receives goods on commission, with instructions to insure, he satisfies those instructions by procuring policies in a responsible company. Mechem, Ag. §§ 510, 1011. And it is difficult to see why a different construction should be given to the receipt of goods under an agreement to insure. Thus, in *Johnson* v. *Campbell*, 120 Mass. 449, it was held that a letter issued by a firm of commission merchants, inviting consignments of goods, and stating that they "will be covered by insurance as soon as received in store," did not import that they were personally to be the insurers of such goods, and that the agreement was performed by their obtaining reasonable and proper insurance against fire. The court observes:

"The circular issued by the firm of Johnson & Co., inviting consignments of goods, does not import that they personally were to be the insurers of such goods against fire. It is simply a promise that the goods shall be insured, or,

in the language of the circular, ' shall be covered by insurance as soon as received in store.' A promise to insure is fulfilled by obtaining a reasonable and proper security against a contingent loss. The commission which they were to charge upon sales was to compensate them for all their charges for guaranty, for effecting and maintaining insurance, and for certain incidental expenses, and services attending the reception and care of property that should be consigned to them."

In the case under consideration the promise was made by an incorporated navigation company whose business is to carry, but not to insure. Indeed, it is questionable whether a contract of insurance would not be beyond the scope of its powers. The evidence of custom establishes the fact that the managers of such companies provide themselves with what are termed "blank policies," running to themselves as agents, for account of whom it may concern; in pursuance of which they issue certificates upon all such cargoes as their customers may wish insured, deriving an incidental profit by the usual commission upon such certificates. Beyond this, the finding shows that four cargoes had previously been shipped under precisely the same circumstances; that similar certificates were issued and deposited with O'Shea, and received by him, without objection. To the argument that O'Shea was not the agent of the plaintiff to receive such certificates or to insure the cargo, it may be said that the cargo was intrusted to Hammond, acting as agent of the Erie road, to carry to Lake Superior and to insure; that neither Chamberlain nor Ward had any dealings whatever with the plaintiff, and I think discharged their entire duty in the matter of insurance by issuing certificates, and delivering them to the party of whom they received the cargo. The contracts to carry and to procure insurance were practically one contract, which was made with the Erie road, and plaintiff has no right now to step in and say that he is not bound by its acts in that connection. We think the receipt and retention of these certificates by O'Shea must be held to estop the plaintiff from making any objection to the form of the policy or to the amount of the insurance.

Aside from this, however, it is not shown that the plaintiff's loss was not fully covered by an insurance of which he was entitled to take the benefit. Had the loss been total, there might have been some question whether the obligation to insure would be satisfied by anything less than an insurance to the full insurable value of the property; but, as the insurance was more than double the loss sustained, it is difficult to see how the plaintiff was prejudiced by failure to insure to its full value. The policy is in the usual form of cargo policies,—the form which has been in use upon the lakes for 20 or 30 years,—and the provision against suit after one year is now so invariable in insurance policies that the court certainly cannot take judicial notice of the fact that it is unusual. The same remark may be made with regard to the provision concerning proofs of loss. Had these proofs been promptly made, as soon as the plaintiff was informed of the loss, and suit begun within a year, we see nothing in the way of a recovery. It is true that the certificate was issued in the name of "Eber Ward, Manager," and the loss, if any, payable "to assured

or order;" but the policy ran to "Eber Ward, Agent," "for account of whom it may concern;" and there is no question that, under the authorities, it may be shown whose interest was intended to be insured, in the same manner as if the plaintiff's name had been mentioned. Extrinsic evidence may always be resorted to for the purpose of ascertaining the interests intended to be covered. *Lee* v. *Adsit*, 37 N. Y. 86; *Castner* v. *Insurance Co.*, 46 Mich. 15, 8 N. W. Rep. 554. A policy upon a cargo in the name of A., "on account of whom it may concern," or with other equivalent terms, will inure to the interest of the party for whom it was intended by A.; provided he, at the time of effecting the insurance, had the requisite authority from such parties, or the latter subsequently adopted his act, (*Hooper* v. *Robinson*, 98 U. S. 528;) and, if an agent procure a policy of insurance in his own name, either the agent or the principal may sue thereon, (*Waring* v. *Insurance Co.*, 45 N. Y. 611.) From the above statement of facts we find, as a conclusion of law, that the defendant has performed the contract set forth by the plaintiff in his declaration, and is entitled to judgment.