The **CONTINENTAL INSURANCE COMPANY and National Ben–Franklin Insurance Company of Illinois, Plaintiffs,**

v.

**Jeffrey H. GARRISON, Christie R. Garrison and NationsBank Corporation, Defendants.**

**No. 98–C–191.**

United States District Court, E.D. Wisconsin.

June 16, 1999.

Barbara A. O'Brien, Borgelt, Powell, Peterson & Frauen, S.C., Milwaukee, WI, Steven Leder, Niles, Barton & Wilmer, Baltimore, MD, for plaintiffs.

Rod W. Rogahn, Rogahn Law Offices, Wind Lake, WI, Michael J. McHale, Daves, Whalen, McHale & Considine, Jensen Beach, FL, for defendants—Garrisons.

Scott Wagner, Amy Kossoris, Hale & Wagner, Milwaukee, WI, for defendants—NationsBank.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

On March 4, 1998, the plaintiffs, The Continental Insurance Company ["Continental"] and National–Ben Franklin Insurance Company of Illinois ["Ben Franklin"], started this action seeking a declaration as to their rights under a policy of insurance issued to the defendants, Jeffrey and Christie Garrison ["the Garrisons"] to cover their 50′ steel hull sailboat.

The original policy was issued by Continental, and it insured the boat from July 1, 1996, to July 1, 1997. At the end of the policy period, the Garrisons renewed the policy for another year with Ben Franklin. The renewal policy was effective from July 1, 1997, to July 1, 1998. In the alternative, the plaintiffs seek recission of the insurance contract on the ground that the Garrisons made material misrepresentations in connection with the renewal of the policy. The plaintiffs also demand indemnification of the money expended to resecure the vessel after it ran aground the coast of Rhode Island.

Presently before the court is the plaintiffs' motion for summary judgment under Rule 56(c), Federal Rules of Civil Procedure. The motion will be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. *See* Rule 56(c), Federal Rules of Civil Procedure. Under Rule 56(c), the movant must show the following: (1) no genuine issue of material fact exists, and (2) its entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Only "genuine" issues of "material" fact will defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As defined by the United States Supreme Court, "material" facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Id.* at 248, 106 S.Ct. 2505. A dispute over such material facts is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). If the evi-

dence presented by the party or parties opposing is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Id.* at 249–250.

## II. UNDISPUTED FACTS

The plaintiffs included with their motion for summary judgment proposed findings of fact which they believed constituted the factual propositions upon which there is no genuine issue of material fact as required under Local Rule 6.05(a). The defendants filed objections to the proposed factual assertions and evidentiary materials supporting those objections. *See* Local Rule 6.05(b)(1). In addition, the defendants filed their own additional proposed factual findings as permitted under Local Rule 6.05(b)(2). The plaintiffs, in turn, filed a reply to the defendants' objections and objections to the defendants' additional proposed factual findings. *See* Local Rule 6.05(c). In deciding a motion for summary judgment, the court will conclude that there is no genuine issue as to any proposed finding of fact to which there is no proper response. Local Rule 6.05(d).

In view of the above, I conclude that there is no genuine dispute concerning the following facts. Dr. Jeffrey Garrison and Christie, who are husband and wife, purchased the S/V PIPESTRELLE, a 50' steel hull sailboat, sometime between June 1993 and July 2, 1993. (Plaintiffs' Proposed Findings of Fact ["PPFF"] at ¶ 1; Defendants' Additional Proposed Findings of Fact ["DAPFF"] at ¶ 1.) The Barnett Bank of Pinellas County gave the Garrisons a mortgage on the S/V PIPESTRELLE. (PPFF at ¶ 2; DAPFF at ¶ 2.) Defendant, NationsBank Corporation, is the successor to Barnett Bank. (PPFF at ¶ 3.)

Commencing on July 1, 1994, Continental issued a marine insurance policy to the Garrisons which insured the S/V PIPESTRELLE. (DAPFF at ¶ 3.) Continental renewed the policy on July 1, 1995, through July 1, 1996, and again on July 1, 1996, through July 1, 1997. (Id. at ¶ 4.)

In 1997, Ben Franklin became the underwriter of the policy. (Id. at ¶ 5.)

BOAT/U.S. is the "marine manager" for Continental and Ben Franklin responsible for selling, negotiating and servicing marine insurance policies. (PPFF at ¶ 5; Aff. of Carroll Robertson, Ex. 10 to Plaintiff's Motion for Summary Judgment.) Further, BOAT/U.S. has underwriting and settlement authority on behalf of Continental and Ben Franklin. (DAPFF at ¶ 23.) The initial marine insurance policy issued to the Garrisons and each renewal policy up through and including the policy for the period July 1, 1996, through July 1, 1997, were delivered to the Garrisons at their St. Petersburg, Florida address. (PPFF at ¶ 6; DAPFF at ¶ 3.) The policy first issued to the Garrisons and each subsequent renewal contained a "Transfer of Interest" clause, which provides:

> Coverage provided by us will terminate automatically if you sell or assign the boat or trailer, or any interest in the policy without our prior written consent; if the boat is legally removed from your custody; or, in the event of an insured's insolvency or bankruptcy.

(PPFF at ¶ 7; DAPFF at ¶ 7.) Under the policy, an "insured" is defined as:

> "You," "your" and "insured person" mean any insured named on the Declarations Page ... and any other person or organization using the insured boat with permission and without compensation.

(DAPFF at ¶ 8.)

With regard to fuel spill liability, salvage and wreck removal, the policy provides as follows:

> We will pay up to that amount for the containment, clean-up and resulting property damage related to any Fuel Spill from the insured boat for which any insured person becomes legally liable through the ownership, maintenance or use of the insured boat. We will settle or defend, as we consider appro-

priate, any claim or suit which asks for these covered expenses and/or damages. In the event of a salvage of the boat or its equipment, charges are limited to an amount not to exceed the Agreed Hull Value as defined by this policy.

We will pay for the removal of the wreck of the insured boat if you are legally obligated to do so even if such attempts to removed the wreck fail.

(DAPFF at ¶ 9.)

The Garrisons entered into a "Contract for Sale and Purchase" ["the contract"] of the S/V PIPESTRELLE on October 18, 1996. (PPFF at ¶ 8; Defendants' Objections to Plaintiffs' Proposed Findings ["Defendants' Objections"] at ¶ 8; Plaintiffs' Reply to Defendants' Objections ["Plaintiffs' Reply"] at ¶ 8.) The contract lists Joe Cavaness as the "Purchaser"; however, the name Joe Cavaness is crossed out and "Advance Equipment Co., Inc." ["AEC"] is handwritten at the end of the first paragraph of the contract. (Plaintiffs' Reply at ¶ 8.) Joe Cavaness is the secretary/treasurer of AEC. (Defendants' Objections at ¶ 8.) According to the terms of the contract, the "Purchaser" was to pay a monthly sum of $1,417.59 in payment of the following expenses: "loan payment to Barnett Bank, slip rental to St. Petersburg Municipal Marina, bottom cleaning, and insurance payments." (Plaintiffs' Objections to Defendants' Additional Proposed Findings of Fact ["Plaintiffs' Objections"] at ¶ 19.) With respect to these expenses, the contract stated that "the Seller will maintain the contracts and remit the payments for the listed expenses, [however] the expenses remain the exclusive responsibility of the Purchaser, . . . ." (Ex. 5 to Plaintiffs' Motion for Summary Judgment.)

The contract further provided that "[t]he sailboat shall be delivered by turning possession from Seller to Purchaser on or before the 18 day of October 1996 at its current port and slip located at Diemans Landing, St. Petersburg, FL." (PPFF at ¶ 9; Motion for Summary Judgment, Ex. 5; DAPFF at ¶ 13.) In his deposition, Mr. Cavaness stated that he took possession of the boat on October 18, 1996, as provided in the contract. (PPFF at ¶ 9; Motion for Summary Judgment, Ex. 15 at 18.) Nevertheless, the Garrisons continued to have access to and use of the S/V PIPESTRELLE after October 18, 1996. (Defendants' Objections at ¶ 9; Plaintiffs' Reply at ¶ 9.) However, Mr. Cavaness recalls that the Garrisons only sailed on the boat one time after entering into the contract and, during this trip, Mr. Cavaness accompanied them. (Id.)

Pursuant to the terms of the contract, the Garrisons were to retain title to the S/V PIPESTRELLE until the full purchase price was paid. (PPFF at ¶ 10; DAPFF at ¶ 12.)

With respect to the choice of laws, the contract provides:

CHOICE OF LAWS: This contract shall be deemed to have been made and entered into within the State of Florida and shall be governed by Florida Law.

(DAPFF at ¶ 11.)

The Garrisons did not obtain prior written consent from BOAT/U.S. before entering into the contract with AEC or before delivering the vessel to Mr. Cavaness on October 18, 1996. (PPFF at ¶¶ 11 and 12; Defendants' Objections at ¶¶ 11 and 12; Plaintiffs' Reply at ¶¶ 11 and 12.) In late 1996, Mrs. Garrison had a conversation with a BOAT/U.S. representative during which Mrs. Garrison was advised that the policy provided coverage for anyone who used the S/V PIPESTRELLE with the Garrisons' permission as long as they were not a paid captain. (DAPFF at ¶ 15.) However, Mrs. Garrison did not inform the BOAT/U.S. representative of the contract for sale and purchase. (Plaintiffs' Objections at ¶ 15.)

The Garrisons relocated to Sheboygan, Wisconsin in January 1997. (PPFF at ¶ 13; Defendants' Objections at ¶ 13; Plaintiffs' Reply at ¶ 13.) The renewal policy for the S/V PIPESTRELLE for the

period July 1, 1997, through July 1, 1998, was delivered to the Garrisons in Sheboygan, Wisconsin. (PPFF at ¶ 14.) Upon renewal of the marine insurance policy, the Garrisons did not inform BOAT/U.S. that they had entered into the contract with AEC. (PPFF at ¶ 15; Defendants' Objections at ¶ 15; Plaintiffs' Reply at ¶ 15.)

BOAT/U.S. is located in Alexandria, Virginia. (PPFF at ¶ 16.) The negotiations regarding the renewal policy for the period July 1, 1997, through July 1, 1998 were telephonic and in writing between Wisconsin and Virginia. (Id. at ¶ 17.) The premiums for the renewal policy were paid by the Garrisons in Sheboygan, Wisconsin. (Id. at ¶ 18.)

The S/V PIPESTRELLE was domiciled in Florida at all relevant times. (Id. at ¶ 19.) While under the command of Mr. Cavaness, the S/V PIPESTRELLE ran aground off the coast of Block Island, Rhode Island, on August 16, 1997. (PPFF at ¶ 20; Defendants' Objections at ¶ 20.) Mr. Cavaness contacted BOAT/U.S. at approximately 1:02 p.m. on August 16, 1997, to report the grounding of the S/V PIPESTRELLE. (PPFF at ¶ 21.) BOAT/U.S. first learned of the contract between the Garrisons and AEC concerning the S/V PIPESTRELLE on August 16, 1997. (PPFF at ¶ 22; Defendants' Objections at ¶ 22.)

Carroll Robertson, vice president of marine insurance claims for BOAT/U.S., issued a verbal reservation of rights to Mr. Cavaness on August 16, 1997, upon learning of the contract between the Garrisons and AEC. (PPFF at ¶ 23; J. Cavaness Depo. at pp. 22–25, Ex. D to Rogahn Aff.) BOAT/U.S. agreed to pay for the wreck removal of S/V PIPESTRELLE under a reservation of rights. (PPFF at ¶ 24; Defendants' Objections at ¶ 24; Plaintiffs' Reply at ¶ 24.) BOAT/U.S. entered into a "No Cure—No Pay" contract with Mitchell Towing and Salvage under a reservation of rights. (PPFF at ¶ 25; Defendants' Objections at ¶ 25; Plaintiffs' Reply at ¶ 25.)

Ms. Robertson and Karen Bridget of BOAT/U.S. both consulted Mr. Cavaness regarding the wreck removal. (Plaintiffs' Objections at ¶ 26.) Agents of BOAT/U.S. attempted to contact the Garrisons on several occasions by telephone but were unsuccessful because the Garrisons were out of town. (Id.) The Coast Guard was concerned over the possibility of a fuel spill. (Id. at 27.)

The S/V PIPESTRELLE was removed from the rocks on August 19, 1997, and is considered a total loss. Mitchell Towing and Salvage was paid $25,000 for the removal. (PPFF at ¶ 26; Defendants' Objections at ¶ 26; Plaintiffs' Reply at ¶ 26; DAPFF at ¶ 22.) After its removal, the S/V PIPESTRELLE was towed to Fairhaven Shipyard where it currently remains. (DAPFF at ¶ 22.)

Ms. Robertson, on behalf of BOAT/U.S., issued a written reservation of rights to the Garrisons on August 22, 1997. (PPFF at ¶ 27.) BOAT/U.S. denied coverage for the loss sustained by the grounding of the S/V PIPESTRELLE on the ground that the contract entered into between the Garrisons and AEC/Mr. Cavaness constituted a transfer of interest for which the underwriters never received notice. (PPFF at ¶ 28; Defendants' Objections at ¶ 28; Plaintiffs' Reply at ¶ 28.)

The Garrisons represented that they owned the S/V PIPESTRELLE upon renewal of their hull insurance contract for the period July 1, 1997, through July 1, 1998, after they entered into the contract for sale and purchase with AEC. (PPFF at ¶ 29.) Had BOAT/U.S. been informed that the S/V PIPESTRELLE had been sold to Mr. Cavaness, it would not have provided coverage for the vessel. (Id. at 30; Defendants' Objections at ¶ 30.)

NationsBank is a "loss payee" under the marine insurance policies issued to the Garrisons for coverage on the S/V PIPESTRELLE. (PPFF at ¶ 31.)

### III. APPLICABLE LAW

The heart of the plaintiffs' motion for summary judgment is the plaintiffs' contention that the insurance policy is void because the Garrisons violated the policy's transfer of interest clause when they sold the S/V PIPESTRELLE to AEC pursuant to the contract for sale and purchase. The defendants assert that a *sale* of the vessel never occurred because title to the S/V PIPESTRELLE was never transferred to AEC.

As a preliminary matter, the court is required to determine what law applies to these issues. The plaintiffs argue that pursuant to Wisconsin's choice of law rules for contract issues, the law of Wisconsin should apply. On the other hand, the defendants maintain that the choice of law provision in the contract for sale and purchase requires this court to apply Florida law. Neither party argues that federal maritime law should apply.

■■■ Because the instant lawsuit involves the interpretation of a *marine* insurance contract, federal jurisdiction is invoked under the Admiralty Clause of the United States Constitution. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313, 75 S.Ct. 368, 99 L.Ed. 337 (1955), citing *Insurance Co. v. Dunham,* 78 U.S. 1, 11 Wall. 1, 20 L.Ed. 90. The United States Supreme Court has held that, in the absence of an established federal maritime rule, state law will control the interpretation of a marine insurance policy. *Id.* at 320–321, 75 S.Ct. 368. The parties concede that there is no established maritime law regarding the interpretation of the marine insurance policy at issue in this case. Accordingly, the court is required to determine which state law applies in accordance with the choice of law rules applicable in the instant forum. *See Albany Ins. Co. v. Wisniewski,* 579 F.Supp. 1004, 1013 (D.R.I.1984).

■■■ The defendants assert that the court need not engage in a choice of law analysis because the contract for sale and purchase contained an express clause making Florida law applicable to the instant lawsuit. The problem with the defendants' assertion is that the instant lawsuit does not arise under the contract for sale and purchase but instead arises under the marine insurance policy issued by the plaintiffs to the Garrisons. The marine insurance policy does not contain a choice of law clause. Therefore, I believe that the choice of law clause in the contract for sale of purchase does not control in this case.

Under Wisconsin's choice of law principles, a "grouping-of-contacts" approach, as embodied in the Restatement (Second) of Conflicts, is utilized in contract cases. *Sybron Transition Corp. v. Sec. Ins. Co. of Hartford,* 107 F.3d 1250, 1255 (7th Cir. 1997). Pursuant to this approach, relevant contacts include:

> [1] the place of contracting; [2] the place of negotiation of the contract; [3] the place of performance; [4] the location of the subject matter of the contract; and [5] the respective domiciles of, places of incorporation and places of business of the parties.

*Id.,* citing *Hystro Prods., Inc. v. MNP Corp.,* 18 F.3d 1384, 1387 (7th Cir.1994). The approach is not a quantitative one; rather, courts must qualitatively determine which contacts are significant and where those contacts are found. *Id.*

■■■ Applying these principles to the insurance policies issued by Continental and Ben Franklin, I find that Wisconsin law governs the interpretation of those policies. The plaintiffs contend—without opposition—that the marine insurance policy issued to the Garrisons for the period July 1, 1997, through July 1, 1998, which was in effect at the time of the boat accident in question, has contact, to some degree, with five different states. Specifically, the undisputed evidence shows that the place of contracting was Wisconsin since the Garrisons accepted the renewal policy in Wisconsin. *See* Restatement (Second) of Conflicts of Law § 188 cmt. (2)e (1971) "the place of contracting is the place where

occurred the last act necessary under the forum's rules of offer and acceptance to give the contract binding effect."; *Eisenberg v. Continental Cas. Co.*, 48 Wis.2d 637, 652, 180 N.W.2d 726, 734 (1970) (Both an offer an acceptance are necessary for the creation of an insurance contract.) The negotiations between BOAT/U.S. and the Garrisons were telephonic between Wisconsin and Virginia. The S/V PIPESTRELLE was located primarily in Florida. The insurance premiums were submitted by the Garrisons from Wisconsin to BOAT/U.S. which is located in Virginia. The boat accident occurred in Rhode Island. At the time of the accident, the Garrisons were domiciled in Wisconsin. Ben Franklin is located in Illinois.

In my opinion, the state of Wisconsin has the most significant contacts with the insurance policy that was in effect at the time of the grounding of the S/V PIPESTRELLE. Wisconsin is the place of contracting, the location of the negotiations on behalf of the negotiations concerning the effective policy and the place of the Garrisons' domicile at the time of renewal of the policy and at the time of the event allegedly giving rise to coverage under the policy. The defendants' contention that the law of Florida should apply because that state has the most contact with the *contract for sale and purchase* is based on the premise that the instant action arises from that contract and not the marine insurance policy. I have already rejected that premise. Thus, I find that Wisconsin substantive law should determine the parties' obligations under the insurance policy in the absence of any established federal maritime law.

## IV. COVERAGE UNDER THE POLICY

■ The plaintiffs seek summary judgment on their claim for a declaratory judgment that the policy was void because the Garrisons' sale of the S/V PIPESTRELLE to AEC without prior written consent violated the policy's transfer of interest clause. The defendants argue that the contract for sale and purchase did not constitute a sale of the vessel because they retained title to the boat at all times.

In order to determine whether the transaction between the Garrisons and AEC constituted a sale under the policy's transfer of interest clause, the court is required to interpret the terms of the marine insurance policy issued to the Garrisons. The interpretation of an insurance policy presents a question of law for the court. *See Greene v. General Cas. Co. of Wisconsin*, 216 Wis.2d 152, 157, 576 N.W.2d 56, 59 (Ct.App.1997), *review denied*, 216 Wis.2d 612, 579 N.W.2d 44 (1998). Insurance policies are to be construed to give their language the common ordinary meaning as that language would be understood by a reasonable person in the position of the insured. *See C.L. by Guerin v. School Dist. of Menomonee Falls*, 221 Wis.2d 692, 697, 585 N.W.2d 826, 828 (Ct.App.1998). Ambiguities in coverage must be construed in favor of coverage, and exclusions must also be narrowly construed against the insurer. *Meyer v. City of Amery*, 185 Wis.2d 537, 543, 518 N.W.2d 296, 298 (Ct.App.1994). A term is ambiguous if it is reasonably susceptible to more than one reasonable interpretation by an insured. *Cardinal v. Leader Nat. Ins. Co.*, 166 Wis.2d 375, 382, 480 N.W.2d 1, 3 (1992).

The transfer of interest clause in the insurance policy provides:

> Coverage provided by us will terminate automatically if you sell or assign the boat or trailer, or any interest in the policy without our prior written consent; if the boat is legally removed from your custody; or, in the event of an insured's insolvency or bankruptcy.

The defendants argue that the terms "sell" and "legally removed from your custody" are ambiguous because they are not defined in the policy. The absence of a definition in the policy, without more, does not render a contractual term ambiguous. Rather, the issue is whether a reasonable insured would have believed that the

transaction between the Garrisons and AEC constituted a sale of the boat under the transfer of interest clause.

Giving the term its ordinary meaning, I believe that a reasonable person would believe that the Garrisons sold their boat to AEC when the parties entered into the contract for sale and purchase. As aptly noted by the plaintiffs, the term sell generally means "to give up (property) to another for money or other valuable consideration." WEBSTER NINTH NEW COLLEGIATE DICTIONARY 1068 (1985).

In the instant case, the contract for sale and purchase required the Garrisons to deliver possession of the vessel to the purchaser on October 18, 1996. Mr. Cavaness, an authorized representative of AEC, states, without opposition, that he took possession of the S/V PIPESTRELLE on that date after he made a substantial down payment and executed the contract for sale and purchase. It is also undisputed that, after execution of the contract, Mr. Cavaness made monthly payments to the Garrisons which represented the expenses associated with the vessel, including slip fees, insurance payments, maintenance, utilities and mortgage payments as required under the contract. Further, after the parties entered into the contract, Mr. Cavaness used the boat as he desired and was not required to seek the Garrisons' permission to utilize the vessel. The fact that the Garrisons were permitted to use the boat after the contract was executed does not, in my opinion, present an issue as to whether possession was in fact delivered to Mr. Cavaness. This is especially so since the evidence shows that, after the contract was executed, the Garrisons did not sail on the vessel without Mr. Cavaness.

The defendants rely on the fact that they retained title to the boat to contend that their transaction with AEC did not amount to a sale. However, the defendants have not pointed to any federal admiralty law or any state case law, nor has the court's own research uncovered any, which holds that a transfer of title is re-quired in order to constitute a sale. While the court's own research has not found any Wisconsin case law directly addressing the issue presented in this case, case law from other states which has addressed the issue hold that title is generally not required for a sale to occur. See *North River Ins. Co. of City of New York v. Waddell,* 216 Ala. 55, 112 So. 336 (1927) (conditional sale violated provision of fire insurance policy against alienation of property); *Excelsior Foundry Co. v. Western Assurance Co.,* 135 Mich. 467, 98 N.W. 9 (1904) (sale of land whereby title would not pass until payment was made in full violated provision in fire insurance policy making it void upon change of interest, title or possession of the subject of the insurance policy).

The defendants also invite the court to adopt the definition of sale set forth in Florida's Uniform Commercial Code wherein "sale" is defined as the "passing of title from the seller to the buyer for a price." Fla.Stat. § 672.106 (1998). The defendants' reliance on this statute is misplaced for two reasons. The court has already determined that Florida law is not the applicable law in this case. Furthermore, reliance on the definition of "sale" utilized by the U.C.C. flies in the face of the rule that terms in insurance policies are to be given their plain and ordinary meaning as understood by a reasonable insured.

In sum, I find that a sale of the S/V PIPESTRELLE occurred when the Garrisons executed the contract for sale and purchase with AEC. In addition, I conclude that when Mr. Cavaness took possession of the boat on October 18, 1996, as provided in the contract, the boat was legally removed from the Garrison's custody. Such removal also implicates the policy's transfer of interest clause.

The undisputed evidence shows that the Garrisons failed to obtain written consent of Ben Franklin or BOAT/U.S. prior to the transaction with AEC. In the absence of such consent, coverage under the insurance policy automatically terminated upon

the sale of the vessel on October 18, 1996. Accordingly, the plaintiffs are not liable to the Garrisons for the loss of the S/V PIPESTRELLE on August 16, 1997.

■ NationsBank, the other defendant in this action, as the loss payee, also cannot recover under the insurance policy. This is so because a loss payee has no greater rights to the proceeds of the policy than the insured—the Garrisons. *See Korntved v. American Ins. Co.*, 216 Wis. 470, 472, 257 N.W. 670, 672 (1934).

## V. INDEMNIFICATION FOR MONEY EXPENDED TO SALVAGE THE BOAT

■ The plaintiffs also seek summary judgment on their claim that they are entitled to be indemnified for the $25,000 it expended to resecure the vessel and protect against potential oil spill liability. The plaintiffs assert that they are entitled to this amount because coverage under the policy terminated automatically when the Garrisons sold the boat and, therefore, they are not responsible for the cost of retrieving and resecuring the vessel.

The defendants argue that a genuine issue of material fact prevents summary judgment on this issue notwithstanding the fact that the policy was void at the time of the accident. Specifically, the defendants argue that there is a genuine issue of material fact as to whether the plaintiffs voluntarily paid for the wreck removal.

Under the policy, the plaintiffs were liable for the costs of removal of fuel and other spills as follows (emphasis added):

we will pay up to that amount for the containment, clean-up and resulting damage related to any Fuel Spill from the insured boat for which any insured person becomes *legally liable* through the ownership, maintenance or use of the insured boat. We will settle or defend, as we consider appropriate, any claim or suit which asks for these covered expenses and/or damages.

(Ex. K to Rogahn Aff. p. 034.) With respect to wreck removal charges, the policy states (emphasis added):

We will pay for the removal or disposal of the wreck of the insured boat *if you are legally obligated to do so* even if such attempts to remove the wreck fail.

(Id. at 033.)

The defendants maintain that the plaintiffs are not entitled to be reimbursed for the wreck removal expenses because the plaintiffs actions were voluntary insofar as the Garrisons were not "legally liable" or "legally obligated" to remove the S/V PIPESTRELLE under the terms of the policy. In my opinion, a genuine issue exists as to whether the Garrisons were legally obligated to remove the vessel from the water. Such issue is material because if it is determined that the Garrisons were not legally required to remove the vessel, the plaintiffs payment of the removal services on their behalf would be viewed as voluntary and not compulsory.

While the plaintiffs have presented evidence that the Coast Guard expressed concern over the possibility of a fuel spill, there is no evidence in the record showing that the plaintiffs or the Garrisons were ordered to remove the vessel by the Coast Guard or any other law enforcement or regulatory agency. Further, there is conflicting evidence in the record as to whether there actually existed any reasonable possibility that a fuel spill would occur. Specifically, the defendants point to the statement of Scott Metzger, a field service supervisor for Clean Harbors Environmental Services, Inc., who was at the scene of the wreck. Mr. Metzger reported that the fuel tank was not breached and would not be breached during salvage operations. (Metzger Dep. at p. 23., Ex. M to Rogahn Aff.) Moreover, it is undisputed that the Garrisons did not give their consent to the removal of the vessel and were never consulted regarding the removal operations.

Thus, I find that a material issue of fact remains as to whether the Garrisons were legally obligated to remove the S/V PI-

PESTRELLE wreckage. Such factual issue precludes summary judgment in favor of the plaintiffs on their indemnification claim.

## VI. DEFENDANTS' COUNTERCLAIMS

The Garrisons have filed a counterclaim against plaintiffs which includes four separate claims: (1) breach of contract; (2) declaratory judgment regarding the parties' rights vis-a-vis coverage under the policy; (3) the plaintiffs made misrepresentations regarding coverage which induced the defendants into entering into the transaction with AEC; and (4) negligent salvage of the vessel by the plaintiffs and/or its agent BOAT/U.S. The plaintiffs argue that they are entitled to summary judgment dismissing all four of the Garrisons' counterclaims.

■ With respect to the first three claims, the plaintiffs maintain that summary judgment is warranted solely because coverage under the policy ceased on October 18, 1996, when, as I have held, the policy automatically terminated. I agree that the defendants' counterclaims for breach of the insurance policy and declaratory judgment must fail in view of my conclusion regarding coverage. The Garrisons do not seriously dispute that fact. However, I do not believe that my conclusion that coverage terminated on October 18, 1996, without more, requires dismissal of the defendants' counterclaim alleging that the plaintiffs made misrepresentations regarding coverage. The fact that coverage terminated on October 18, 1996, does not automatically mean that the plaintiffs could not be liable for misrepresentation after that date.

As to the defendants' counterclaim for negligent salvage, the plaintiffs contend that they are entitled to summary judgment because the defendants are unable to sustain their burden of proof. This counterclaim alleges that the salvors retained by BOAT/U.S. on behalf of the plaintiffs were not equipped to handle the salvage of the S/V PIPESTRELLE and as a direct and proximate cause, the vessel sustained further and substantial damage during the three day period after the loss occurred.

■ Admiralty law recognizes a claim for negligent salvage against salvors. *See Aetna Ins. Co. v. Meeker*, 953 F.2d 1328 (11th Cir.1992). In general, a salvor will not be held liable for negligent salvage absent a showing of gross negligence or willful misconduct. *The Noah's Ark v. Bentley and Felton Corp.*, 292 F.2d 437, 440–441 (5th Cir.1961); *Sands v. One Unnamed 23' Seacraft, Pleasure Vessel*, 959 F.Supp. 1488, 1494 (M.D.Fla.1997), *aff'd* 144 F.3d 55 (11th Cir.1998). The defendants' counterclaim is unusual in that it seeks relief against the insurance company, not the salvor, for negligent salvage under the theory that the salvors were agents of the insurance company. Thus, in order to prevail on their negligent salvage claim in this case, the defendants must show that the salvors were agents of the plaintiffs and that the salvors engaged in gross negligence or willful misconduct.

The plaintiffs assert that the Garrisons falter on both of these elements. They argue that the salvor—TowBOAT/U.S.— was an independent contractor as opposed to their agent. The plaintiffs also contend that the defendants have failed to provide any evidence from which a reasonable jury could conclude that the salvor was negligent.

■ While it appears that there is an issue of fact as to whether the salvor was an agent of the plaintiffs or an independent contractor, such fact is not material because the defendants have failed to offer one shred of evidence which even arguably suggests that the salvor was negligent in salvaging the S/V PIPESTRELLE. Furthermore, the Garrisons have not articulated how the conduct of the salvor fell below the appropriate standard of care in this case.

In an attempt to create an issue of fact as to the negligence of the salvor, the

defendants point to the deposition of the Charles Mitchell—the owner of the towing company which successfully removed the vessel from its stranded position on August 19, 1997. In his deposition, Mr. Mitchell stated that his "normal salvage posture is to be available immediately for deployment to such incidents." (Rogahn Aff. Ex. N at 38.) This is the only evidence offered by the Garrisons to support their claim that TowBOAT/U.S. was negligent. The defendants have not pointed to any evidence regarding the appropriate standard of care or evidence from which a jury could conclude that the actions undertaken by TowBOAT/U.S. were below that standard. In my opinion, evidence concerning what another salvor would have done under the circumstances, without more, does not satisfy the defendants' burden with respect to their negligent salvage claim.

Accordingly, the plaintiffs' motion for summary judgment will be granted with respect to the defendants' counterclaims for breach of contract, declaratory judgment and negligent salvage. However, the plaintiffs' motion for summary judgment will be denied with respect to the defendants' counterclaim for misrepresentation.

### ORDER

Therefore, IT IS ORDERED that the plaintiffs' motion for summary judgment be and hereby is granted, in part, and denied, in part.

IT IS ALSO ORDERED that the plaintiffs' be and hereby are entitled to summary judgment declaring that the marine insurance policy issued to the Garrisons automatically terminated on October 18, 1996, such that the Garrisons are not entitled to coverage for their loss of the S/V PIPESTRELLE.

IT IS FURTHER ORDERED that summary judgment be and hereby is granted with respect to the defendants' counterclaims for breach of contract, declaratory judgment and negligent salvage.

IT IS FURTHER ORDERED that the Garrisons' counterclaims for breach of contract, declaratory judgment and negligent salvage be and hereby are dismissed, with prejudice.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment be and hereby is denied with respect to the plaintiffs' claim for indemnification and with respect to the Garrisons' counterclaim for misrepresentation.

IT IS FURTHER ORDERED that the parties be and hereby are directed to bear their own costs associated with the plaintiffs' motion for summary judgment.